## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

The Thomas L. Pearson and The Pearson
Family Members Foundation, and
Thomas L. Pearson, individually,

        Plaintiffs and
        Counterclaim Defendants,

    v.

The University of Chicago,

        Defendant and
        Counterclaimant.

**Case No. 3:20-mc-00092-CSH**

**January 20, 2021**

## DECISION AND ORDERS ON
## MOVANT GEORGE LEDWITH'S AMENDED MOTION TO QUASH

**HAIGHT, Senior District Judge:**

George Ledwith ("Ledwith"), by an Amended Motion [Doc. 3], petitions this Court pursuant to Rule 45(d) of the Federal Rules of Civil Procedure to quash a subpoena for documents and a deposition issued to him on September 4, 2020 (the "September 2020 Subpoena") by the University of Chicago (the "University") in the course of *The Thomas L. Pearson and The Pearson Family Members Foundation, et al. v. The University of Chicago*, Case No. 4:18-cv-00099-JFH-JFJ (N.D. Okla.) (the "Oklahoma Action"). Am. Mot. at 1. Ledwith, a Connecticut resident, contends that the September 2020 Subpoena imposes an undue burden on him: Ledwith argues that he is a third-party who "was not involved" in conduct underlying the claims at issue in the Oklahoma Action, and that he has health conditions that would make it "difficult" for him to attend a deposition. *Id.* For the reasons set forth below, the Court GRANTS IN PART Ledwith's motion, insofar as it orders certain accommodations for his health during his deposition, and DENIES Ledwith's motion in all other respects.

## I.      Background

### a.  The Oklahoma Action

This motion to quash arises out of litigation between The Thomas L. Pearson and The Pearson Family Members Foundation (the "Foundation"), Thomas L. Pearson in his individual capacity ("Tom Pearson," and together with the Foundation, "the Pearsons"), and the University, concerning a $100 million grant made by the Foundation in 2015 to establish The Pearson Institute for the Study and Resolution of Global Conflicts (the "Institute") and The Pearson Global Forum (the "Forum").  Am. Mot. at 1, 2; Resp. [Doc. 13] at 2.  Through this gift, the Pearsons intended to honor the Pearson family's legacy of engagement with peace and social justice efforts by creating a leading center for the study and practice of global conflicts resolution.  First. Am. Compl. [Am. Mot. Ex. B] ¶¶ 1, 15-16.  The Foundation's principal officers, Tom Pearson and Timothy R. Pearson ("Tim Pearson"), allegedly selected the University to house the Institute and the Forum "because of [the University's] representations that it is one of the world's great academic institutions, and that its learning environment values rigorous study driven by data and evidence."  *Id.* ¶¶ 15, 17.

While one might hope that the Pearsons' generosity would sustain a long, happy, and fruitful relationship between the University and the Pearson family, such an outcome has not come to pass.  In the Oklahoma Action, the Pearsons allege that the University not only failed to carry out numerous duties under the parties' Grant Agreement establishing the Institute and the Forum, but indeed misrepresented or omitted key facts relating to the Institute and the Forum's budget and the University's finances when the parties negotiated the Grant Agreement.  *See id.* ¶¶ 19-85.[1]  The Pearsons bring multiple causes of action against the University, including for

---

[1] The University, needless to say, views the Institute's and the Forum's first years in operation very differently, representing to this Court that it "has, among other notable accomplishments, appointed esteemed faculty—

breach of contract, for breach of the duty of good faith and fair dealing, for fraudulent inducement, and for unilateral mistake. *See id.* ¶¶ 86-112. The Pearsons seek, *inter alia*, the return of the grant amounts that have been paid to the University (approximately $25 million) and equitable rescission of the Grant Agreement. *Id.* ¶¶ 8, 90, 94, 99, 106, 112. The University, in turn, has counterclaimed against the Pearsons for breach of contract, for the Pearsons' failure to pay amounts due under the Grant Agreement beginning in 2017. *See generally* Def.'s Third Am. Countercl., *The Thomas L. Pearson and The Pearson Family Members Foundation, et al. v. The University of Chicago*, Case No. 4:18-cv-00099-JFH-JFJ (N.D. Okla. Aug. 31, 2020) [Doc. 165]. The parties have engaged in significant motion practice to date, and discovery—the process begetting the instant motion—is set to close on February 8, 2021. Am. Sched. Order, *The Thomas L. Pearson and The Pearson Family Members Foundation, et al. v. The University of Chicago*, Case No. 4:18-cv-00099-JFH-JFJ (N.D. Okla. Nov. 19, 2020) [Doc. 171].

### b. Ledwith's Relationship with the Pearson Family and the Underlying Controversy

Ledwith is a friend and former colleague of Tim Pearson's, the two having worked together at KPMG for a decade prior to 2007. Am. Decl. [Doc. 3-1] ¶ 4; Univ. Ex. 1 [Doc. 15] at 58:1-59:2, 62:8-62:15, 220:2-220:9; Reply [Doc. 17] at 2. Ledwith is not a party to the Oklahoma Action, nor is he an employee of any of the parties. Am. Decl. ¶ 3. Nevertheless, Ledwith is not unfamiliar with the Pearsons' gift: at the time of the grant's announcement, the Pearson Foundation engaged him "to provide journalistic writing, editing and external media

---

including a Nobel Prize winner—to the four chaired positions within the Pearson Institute, recruited a world-renowned scholar on conflict studies to lead the institute, and held signature international conferences, including three Global Forums that have attracted leading scholars and policy-makers from around the world." Resp. at 2. The University furthermore denies that it made any misrepresentations or omissions vis-à-vis the Pearsons. Def.'s Answer to First Am. Compl. ¶¶ 73-85, *The Thomas L. Pearson and The Pearson Family Members Foundation, et al. v. The University of Chicago*, Case No. 4:18-cv-00099-JFH-JFJ (N.D. Okla. Dec. 9, 2019) [Doc. 118].

advice" related to the Institute and the Forum, and he later was engaged by the University as "an outside media consultant" to continue similar work. *Id.* ¶ 4. Ledwith states that his work concerning the Institute and the Forum ended in the spring of 2017. *Id.* ¶ 5.

In his motion and accompanying declaration, Ledwith portrays his role with respect to the Pearsons' grant as—at most—modest, and in any event unconnected with core aspects of the Pearsons' and the University's dispute. Ledwith avers that he "was not involved in the creation of the grant agreement that is at issue in the [Oklahoma Action], . . . did not have any input on the provisions of that agreement, . . . was not involved in any of the alleged breaches of the agreement listed in the [Oklahoma Action]," and had no involvement in the administration of the Pearsons' grant. *Id.* ¶ 3; *see also* Am. Mot. at 1-3, 5. The University's submissions to this Court, however, suggest that Ledwith possesses more detailed knowledge of the Pearsons' grant, as well as of the relationship between the University and the Pearsons, than appears on the face of Ledwith's papers. Notably, the University's exhibits show—and Ledwith does not contest—that:

- Prior to the execution of the Grant Agreement, Tim Pearson sought Ledwith's comments on the Agreement's provisions, which Ledwith duly rendered, including a general assessment that "Well, the University couldn't wiggle around the stated terms and details of this Agreement if Harry Houdini was on the faculty. It reads in part like the legal version of a sealed vault." Univ. Ex. 2 [Doc. 13-1].

- While working as a consultant for the University,[2] Ledwith opined to the Pearsons on the University's efforts—and perceived faults—in setting up the Institute. *See* Univ. Ex. 6

---

[2] Ledwith appears to have been engaged by the University as a consultant in the autumn of 2015, after the Institute and the Forum made their public debut. *See* Resp. at 4 n.1; Univ. Ex. 1 at 59:21-60:6 ("Q: After the announcement of the gift on September 30, 2015, did Mr. Ledwith continue to give advice to you and your brother, Tom, in

[Doc. 13-2]; *see also* Univ. Ex. 14 [Doc. 13-4].  Ledwith's commentary extended to matters beyond media strategy and materials, such as the recruitment of an Executive Director for the Institute.  *See* Univ. Ex. 4 [Doc. 14-3].  It appears Ledwith also may have discussed the University's financial situation with the Pearsons in February 2016, following a purported conversation between Tim Pearson and University President Robert Zimmer in January 2016.  *See* Univ. Ex. 1 at 219:2-221:13.

- As the parties' relationship became increasingly fraught through the summer and fall of 2017, Ledwith counseled the Pearsons whether it was in their interest or ability to make a joint statement with the University regarding the grant.  *See* Univ. Ex. 10 [Doc. 14-9]. Ledwith subsequently appears to have had a conversation with Tim Pearson about the Pearsons' upcoming mediation with the University.  *See* Univ. Ex. 11 [Doc. 13-3].

The correspondence cited by the University and set forth here appears to be but a small portion of Ledwith's total correspondence related to the Pearsons' gift: the University notes that its review of documents and information produced to date indicates that Ledwith has sent approximately 800 emails to Tim and/or Tom Pearson regarding the Institute.  Resp. at 7.

### c.  The University's Prior Subpoena and the Current Motion to Quash

The University previously has sought documents from Ledwith by way of a subpoena dated June 5, 2019 (the "June 2019 Subpoena.").[3]  Am. Decl. ¶ 2.  Ledwith contends that he produced all documents relevant to the University's requests, a total of approximately 7,000

---

connection with the relationship with University . . .? . . . The Witness: I would say, to be technically correct, George, with our support, was retained by the [U]niversity as a contractor to the [U]niversity . . . .").

[3] The Court notes that Ledwith in his motion refers to a subpoena issued in July 2019, although both his declaration and the text of the September 2020 Subpoena refer only to the June 2019 Subpoena.  *Compare* Am. Mot. at 3, 6; *with* Am. Decl. ¶ 2, *and* Am. Mot. Ex. A. at 5.  The University's response similarly contains an incomplete reference to "July 2019," while otherwise referring to the June 2019 Subpoena.  Resp. at 6.  Because the exact date of the first subpoena is not dispositive of the issues at hand, the Court shall assume that references to July 2019 are scrivener's error.

pages.[4]  Am. Mot. at 3, 6; Am. Decl. ¶¶ 2, 6.  On September 4, 2020, however, the University

issued a second subpoena—the September 2020 Subpoena—containing a request for "All

documents and communications responsive to the subpoena previously issued to Mr. Ledwith in

this matter that have not already been produced, including but not limited to documents and

communications created between June 5, 2019 and the present."  Am. Decl. ¶ 7; Am. Mot. Ex.

A. at 5.  The September 2020 Subpoena also commands Ledwith's attendance at a deposition to

be conducted remotely, by video; this deposition was scheduled to take place on September 29,

2020.  Am. Mot. Ex. A. at 1.

On November 6, 2020, Ledwith filed a motion with this Court to quash the September

2020 Subpoena. *See generally* Mot. [Doc. 1].  Ledwith subsequently filed his operative, amended

motion [Doc. 3] on November 9, 2020.  The University submitted its memorandum in response

[Docs. 13-14] on November 30, 2020,[5] and Ledwith replied [Doc. 17] on December 14, 2020.

## II.    Legal Standard

Rule 26 of the Federal Rules of Civil Procedure governs the scope of discovery that

parties to a litigation may undertake.   A party "may obtain discovery regarding *any*

nonprivileged matter that is relevant to *any* party's claim *or* defense and proportional to the

needs of the case . . . Information within this scope of discovery *need not be admissible in*

*evidence* to be discoverable."  Fed. R. Civ. P. 26(b)(1) (emphasis added).  "Relevance" within

the meaning of Rule 26(b) is broad, "encompass[ing] any matter that bears on, or that reasonably

could lead to other matter that could bear on any party's claim or defense." *Bagley v. Yale Univ.*,

No. 3:13-cv-01890 (CSH), 2015 WL 8750901, at *7 (D. Conn. Dec. 14, 2015) (quoting *State*

---

[4] According to the University, Ledwith's production consists of approximately 2,500 *documents*.  Resp. at 1.

[5] The University additionally submitted exhibits [Docs. 15-16] on December 1, 2020 that it failed to append to its November 30, 2020 filing.

*Farm Mut. Auto. Ins. Co. v. Fayda*, No. 14 Civ. 9792 (WHP) (JCF), 2015 WL 7871037, at *2 (S.D.N.Y. Dec. 3, 2015)). The scope of discovery permitted by Rule 26 applies equally to discovery from non-parties pursuant to Rule 45 of the Federal Rules of Civil Procedure. *See Crespo v. Beauton*, No. 15-cv-412 (WWE) (WIG), 2016 WL 259637, at *2 (D. Conn. Jan. 21, 2016); *see also Dominion Res. Servs., Inc. v. Alstom Power, Inc.*, Civ. No. 3:16-cv-00544 (JCH), 2017 WL 3575892, at *1 (D. Conn. Aug. 18, 2017). Determining whether a party's discovery requests are relevant depends on the facts of a given case. *See, e.g.*, *Badr v. Liberty Mut. Grp., Inc.*, Civ. No. 3:06-cv-1208 (AHN), 2007 WL 2904210, at *2 (D. Conn. Sept. 28, 2007) ("[W]hether a specific discovery request seeks information relevant to a claim or defense will turn on the specific circumstances of the pending action.") (quotation marks and citation omitted).

Rule 45(d) mandates that the court for the district where compliance with a subpoena is required quash (or modify) a subpoena issued to a non-party where the court finds, *inter alia*, that the subpoena imposes an undue burden on the non-party movant. Fed. R. Civ. P. 45(d)(3)(iv). "Whether a subpoena imposes an undue burden depends on such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed." *Jackson v. AFSCME Local 196*, 246 F.R.D. 410, 412 (D. Conn. 2007) (quotation marks and citation omitted). A court "give[s] special weight to the burden on non-parties of producing documents to parties involved in litigation." *Travelers Indem. Co. v. Metro. Life Ins. Co.*, 228 F.R.D. 111, 113 (D. Conn. 2005); *see also Tucker v. Am. Int'l Grp., Inc.*, 281 F.R.D. 85, 92 (D. Conn. 2012) ("Within this Circuit, courts have held nonparty status to be a significant factor in determining whether discovery is unduly burdensome.") (quotation marks and citation

omitted).

Ultimately, "[t]he burden of persuasion in a motion to quash a subpoena is borne by the movant." *Travelers Indem. Co.*, 228 F.R.D. at 113; *see also GEOMC Co., Ltd. v. Calmare Therapeutics, Inc.*, No. 3:14-cv-1222 (VAB), 2020 WL 6375562, at *3 (D. Conn. Oct. 30, 2020) ("The objecting party bears the burden of demonstrating *specifically* how, despite the broad and liberal construction afforded by the federal discovery rules, each request is not relevant or how each question is overly broad, unduly burdensome or oppressive.") (quoting and citing *Klein v. AIG Trading Grp. Inc.*, 228 F.R.D. 418, 422 (D. Conn. 2005)) (emphasis added). A court enjoys wide discretion in determining whether to uphold, quash, or modify a subpoena, as in other matters of pre-trial discovery. *In re Fitch, Inc.*, 330 F.3d 104, 108 (2d Cir. 2003); *see also Jackson*, 246 F.R.D. at 412.

### III. Discussion

Ledwith raises three arguments in support of his motion: that his documents and testimony are not relevant, that his documents would be duplicative of discovery already had (or available) from the parties, and that his current physical condition precludes him from sitting for a deposition. The Court addresses each of these arguments in turn.

#### a. Ledwith's Documents and Testimony Are Relevant

Ledwith's first argument is that responding to the September 2020 Subpoena would be unduly burdensome because, at bottom, his documents and testimony are not relevant to the Oklahoma Action. Ledwith contends that he "had nothing to do with [the University's] breaches of the Grant Agreement," that "[n]one of the communications work [he] performed is at issue in the litigation," and that "[m]any of the allegations in the [l]awsuit occurred after his engagement ended." Am. Mot. at 5-6. In his motion, and again in his reply brief, Ledwith presses that he

played no role in the University's failures, *inter alia*, to name an executive director, to hire appropriate faculty, to deliver an operating plan and budget, to award scholarships, and to provide leadership from University senior management. *Id.* at 5; Reply at 2.

As an initial matter, Ledwith's contention that "[m]any of the allegations in the [l]awsuit occurred after his engagement ended," Am. Mot. at 5-6, is belied by his own declaration that his work concerning the Institute and the Forum ended in the spring of 2017, Am. Decl. ¶ 5. The Pearsons allege conduct constituting or contributing to several of the University's purported breaches during this period. *See, e.g.*, First Am. Compl. ¶¶ 20-30, 43-48 (describing alleged University failures to appoint an Executive Director for the Institute and to provide appropriate senior University leadership stewardship of the grant). More fundamentally, though, the Court finds Ledwith's argument regarding relevance unpersuasive because the scope of relevance assumed in his motion is too narrow. Ledwith's motion appears to proceed from the premise that the Oklahoma Action is merely an action for breach of contract, neglecting that the Pearsons bring other causes of action—e.g., for breach of the duty of good faith and fair dealing. First Am. Compl. ¶¶ 91-94. Furthermore, Ledwith entirely ignores that the University has raised various affirmative defenses—e.g., for unclean hands, premised in part on the Pearsons' hindering the University's efforts to fill the Institute's Executive Director position. Def.'s Answer to First Am. Compl. ¶¶ 122-25.

While it may be true that Ledwith played no role in shaping or carrying out *the University's* actions, the Court is not persuaded that Ledwith had no role with respect to how the Pearsons engaged with the University, or indeed that he was not even a passive witness to the interactions of the Pearsons and the University, such that he would lack information related to *any* of the claims and defenses in suit. For example:

9

- In September 2015, after the Grant Agreement had been executed and just prior to the Institute's and the Forum's announcement to the public, Ledwith told Tim Pearson that he believed the University had "deceived the family all this time," and indicated his agreement with Tom Pearson's description of the University as "disingenuous," in response to an email Tim Pearson forwarded to him reflecting part of Tim Pearson's discussion with University personnel about whether and how to "rank" the Pearson gift relative to other major gifts to the University.  Resp. at 9; University Ex. 13 [Doc. 14-11] at PEARSON_032865.  This exchange, as well as others, suggests to the Court that Ledwith has information pertinent to the Pearsons' claim that the University did not act in good faith.  First Am. Compl. ¶¶ 91-94  *See also, e.g.*, Univ. Ex. 14 (June 2-3, 2016 email chain reflecting Ledwith's assessment that University employee's handling of press release reflected "no accountability, low energy and a seemingly cavalier attitude" on part of University's communications team, and Tim Pearson's agreement with that assessment).

- At multiple points, Ledwith expressed concerns about or displeasure regarding Provost Daniel Diermeier's stewardship of the Institute and the University-Pearson relationship.  *See* Univ. Ex. 3 [Doc. 14-2] (email expressing Ledwith's concern regarding Diermeier's appointment to provost position and implications for Institute); Univ. Ex. 6 (email chain reflecting Ledwith's frustration regarding University employee's handling of press release and expressing "surprise[] that Daniel just handed it off and didn't review [the other employee's] changes"); Univ. Ex. 15 [Doc. 14-13] (email chain reflecting Ledwith's assessment that Diermeier's invitation to Tim and Tom Pearson for a special event was "perfunctory" and "reveals his lack of respect for the recipients").  These and

other documents suggest to the Court that Ledwith plausibly has information concerning the Pearson's allegation that "Provost Diermeier has failed to adequately discharge his responsibilities for the proper administration and management of TPI and the stewardship of the Foundation's grant."  First Am. Compl. ¶ 48.

- In response to an email chain forwarded by Tim Pearson on November 29, 2016, Ledwith commented on how he thought the executive search firm conducting outreach to candidates for the Institute's Executive Director position did not "understand the mission [of] the Institute," and additionally offered his own assessment of the three candidates that had been approached.  Univ. Ex. 4 at PEARSON_020602.  This email suggests to the Court that Ledwith plausibly possesses information related to the University's affirmative defense that the Pearsons "hindered the University's efforts to fill" the Executive Director position.  Def.'s Answer to First Am. Compl. ¶¶ 123.

- A portion of Tim Pearson's deposition transcript, which the University has appended to its response, concerns testimony by Tim Pearson related to an email Ledwith sent to him in February 2016 regarding information from Crain's about the University's finances.  *See* Univ. Ex. 1 at 219:2-221:13.  As reflected in the deposition transcript, Tim Pearson responded to Ledwith's email by writing "George, we actually spoke with President Zimmer about this in Park City. I can give you some contextual background when we talk next."  *Id.* at 220:12-220:14.  This suggests to the Court that Ledwith plausibly may have information related to what the Pearsons knew or should have known regarding the University's finances, including any uncertainty as to the University's financial position.  *See* First Am. Compl. ¶ 84 ("The University deliberately concealed from the Plaintiffs at the time the Grant Agreement was executed, and as subsequent gifts were made by the

Foundation . . . (b) that the University's financial position was uncertain and that the University was searching for ways to cut costs . . . .").

Even if Ledwith was not a "principal advisor" to the Pearsons, *see* Reply at 2, the above evidence (among other exhibits offered by the University) convinces the Court of the propriety of subjecting Ledwith to additional discovery.  As noted above, Rule 26 allows discovery related to *any* party's claim *or* defense, and the evidence sought by a party may be *either* for admission at trial *or* for the discovery of trial-admissible evidence. Fed. R. Civ. P. 26(b)(1); *Bagley*, 2015 WL 8750901, at *7.  The Federal Rules in no way require that Ledwith have been the Pearsons' "Svengali," *see* Reply at 3, to be subject to further discovery by the University.  Ledwith at no point satisfactorily explains—and likely cannot explain—how the University's specific evidence is unconnected with any claim or defense contested in the underlying action, and why the Court should infer that additional evidence would be similarly unmoored.  Absent a "clear showing that the documents . . . sought [are] so untethered to the allegations" that the Court must quash the University's request in its entirety, the Court here is not prepared to deny the University the discovery it seeks.  *See In re Speer*, 754 Fed. App'x 62, 64 (2d Cir. 2019).

The evidence adduced by the University similarly shows that Ledwith has failed to carry his burden with respect to quashing the request for his deposition testimony.  As this Court has stated in a prior matter, "an order barring a litigant from taking a deposition is most extraordinary relief," and the movant has the burden of showing that "the proposed deponent has nothing to contribute."  *U.S. Reg'l Econ. Dev. Auth., LLC v. Matthews*, No. 3:16-cv-01093 (CSH), 2018 WL 2172713, at *12 (D. Conn. May 10, 2018) (quoting *Speadmark, Inc. v. Federated Dep't Stores, Inc.*, 176 F.R.D. 116, 118 (S.D.N.Y. 1997)).  Here—as there—the proponent of the motion to quash has asserted in largely conclusory fashion that the proposed

deponent would offer testimony of little to no value, and thus has "not demonstrated an appropriate basis for barring" the deposition. *See id.*

### b.  Ledwith's Documents and Testimony Are Not Evidently Duplicative

Ledwith's next contends that the September 2020 Subpoena is unduly burdensome because "[e]very responsive document in [his] possession either was produced in 2019, or is duplicative of documents already in the possession of the Parties themselves. After all, the only relevant communications he could have . . . would be with Plaintiffs or the University . . . . And any relevant testimony likewise would be duplicative of testimony of the Plaintiffs and/or the University and its staff." Am. Mot. at 6; *see also* Am. Decl. ¶¶ 6-8.

As an abstract proposition, it seems plausible that any documents Ledwith might possess that would be responsive to the September 2020 Subpoena also would be available from the parties, but Ledwith's speculation that this is so is not sufficient to persuade the Court that the University's request is so duplicative as to constitute an undue burden.  As the University points out, Ledwith "does not support or explain *how* he could know whether any remaining, unproduced responsive documents he has are also in the possession of the University."  Resp. at 10 (emphasis added).  Indeed, the University states that Ledwith's production in response to the June 2019 Subpoena was *non*-duplicative of what was contained in the Pearsons' productions and helped the University to identify documents the Pearsons had withheld but that are relevant. Resp. at 10.  Using discovery from a non-party to vet the fulsomeness of a party's discovery is permissible under the Federal Rules.  *See, e.g.*, *Amphenol Corp. v. Fractus, S.A.*, 19 Misc. 160 (PAE), 2019 WL 2521300, at *11 (S.D.N.Y. June 19, 2019) (denying non-party antenna manufacturer's motion to quash, although discovery from non-party was possibly somewhat duplicative of discovery from telecom parties in underlying patent action, given that non-party

had an important role in telecom parties' conduct related to the patent suit, and where plaintiff

had encountered discrepancies between party and non-party discovery, with the court noting that

it was "appropriate" for plaintiff to investigate such gaps); *New Park Entm't L.L.C. v. Elec.*

*Factory Concerts, Inc.*, No. Civ. A. 98–775, 2000 WL 62315, at *5 (E.D. Pa. Jan. 13, 2000)

(denying, in relevant part, effort to quash third-party subpoenas where plaintiff sought "not only

[to] supplement . . . defendants' productions, but also to test the veracity of defendants'

assertions that they have produced all the documents they were required to produce").  Absent

any indication from Ledwith to the contrary (which has not been forthcoming), it seems to the

Court that Ledwith's response to the September 2020 Subpoena could again play this role, and

the Court will not prevent it.[6]

As regards Ledwith's testimony: Ledwith's argument in his amended motion that it

would be duplicative of other testimony is wholly conclusory.  *See* Am. Mot. at 6.  By way of his

reply, Ledwith appears to argue in addition that, having deposed Tim and Tom Pearson, and not

having then elicited substantive testimony related to Ledwith, the University now should not be

permitted another opportunity to address topics related to him.  Reply at 4.[7]  Quite simply, this is

not the law.  "[N]othing in the Federal Rules of Civil Procedure requires a litigant to rely solely

on discovery obtained from an adversary instead of utilizing subpoenas."  *State Farm Mut. Auto.*

*Ins. Co. v. Accurate Med., P.C.*, No. CV 2007-0051 (ENV) (MDG), 2007 WL 2993840, at *1

---

[6] The Court further notes its doubts that the absolute volume of documents responsive to the September 2020 Subpoena is large, given: 1) the September 2020 Subpoena's primary focus on documents dating from the limited period between the June 2019 Subpoena and the September 2020 Subpoena; 2) the fact that Ledwith's known correspondence related to the Pearsons' grant consists of hundreds of—and not tens of thousands of—emails; and 3) the fact that Ledwith's prior production was of approximately 2,500 documents.

[7] The remainder of Ledwith's "argument" in reply regarding the duplicative nature of his testimony really is just another argument regarding his testimony's relevance.  *E.g.*, "The University again does not explain why Mr. Ledwith's 'impressions,' 'criticisms,' or 'understandings' of the Pearson Institute are *relevant* at all to understanding (1) whether the University properly administered the grant, (2) the deterioration of the relationship between the Pearsons and the University, or (3) any other matter in the Oklahoma Action."  Reply at 4 (emphasis added).  For the reasons previously detailed in this decision, Ledwith's broad objection on the basis of relevance is rejected.

(E.D.N.Y. Oct. 10, 2007) (citing *Covey Oil Co. v. Cont'l Oil Co.,* 340 F.2d 993, 998 (10th Cir. 1965) ("[A] person may not avoid a subpoena by saying that the evidence sought from him is obtainable from another.")).  The Court agrees with the University that there is no better person than Ledwith himself to testify regarding Ledwith's knowledge of and relation to the subject matter of the underlying controversy, *see* Resp. at 10, and the Federal Rules do not compel the University to forgo such testimony just because it could have pursued a theoretical inferior substitute that was available at an earlier opportunity.

In sum, there is no reasonable basis in this case to say that the University has assembled or is likely to assemble the evidentiary record to which it is entitled under the Federal Rules without the need for the discovery requested from the resisting non-party.  *Compare Tucker*, 281 F.R.D. at 95-96 (denying plaintiff motion to compel where plaintiff conceded having independently received emails sought from non-party insurance broker and plaintiff already had engaged in "extensive, alternative" discovery).  Thus, the Court cannot find that Ledwith faces an undue burden on account of duplicative discovery.[8]

### c.  Ledwith's Current Physical Condition Does Not Warrant Quashing the Subpoena

Ledwith's final argument is that his poor health, caused by numerous physical ailments,

---

[8] The Court notes that Ledwith apparently has undertaken some search for documents in response to the September 2020 Subpoena—covering documents in the period May 31, 2019 through December 10, 2020—and claims that this search uncovered no "relevant" documents.  Reply at 4 n.2.  "Under ordinary circumstances, a party's good faith averment that the items sought simply do not exist, or are not in his possession, custody or control, should resolve the issue of failure of production." *Certain Underwriters at Lloyd's v. Nat'l R.R. Passenger Corp.*, No. 14-CV-4717 (FB), 2017 WL 177626, at *2 (E.D.N.Y. Jan. 17, 2017) (quoting and citing *Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135, 152 (S.D.N.Y. 1997)).  Here, however, the Court is unsure whether Ledwith's determination of the "relevance" of the documents reviewed has been in accord with the bounds of relevance described in this decision.  Furthermore, Ledwith's search did not evidently address documents that would have been responsive to the June 2019 Subpoena but that had not been produced previously, which also are encompassed by the September 2020 Subpoena's terms.  On this basis, the Court is not prepared to say that Ledwith's search was sufficient to fulfill his discovery obligations.  The Court believes that any burden that may result from a follow-up search for Ledwith's responsive documents will not be unreasonable to him, given evidence that the Foundation is

would make sitting for a deposition unduly burdensome, especially in light of the limited relevant knowledge he purports to have.  Am. Mot. at 7.  By declaration, Ledwith states that his conditions include recurrent prostate cancer requiring daily radiation treatment, aortic stenosis, peripheral neuropathy, and emphysema.  Am. Decl. ¶ 9.  Ledwith avers that "These conditions have affected my health and make it difficult to perform prolonged tasks such as sitting for a deposition."  *Id.* at 10.

As explained above, it is unusual for a court to prohibit a deposition entirely, and courts' reluctance to prevent depositions from taking place extends even to circumstances where deponents are in frail health.  Where a deponent has been excused from testifying, it appears to the Court only to have been for severe circumstances documented by appropriate medical authority.  *Compare Dunford v. Rolly Marine Serv. Co.*, 233 F.R.D. 635, 637 (S.D. Fla. 2005) (granting protective order precluding deposition of non-party witness, where doctor's affidavit attested to life-threatening, acute brain condition of non-party); *with Smith v. Yeager*, 322 F.R.D. 96, 99 (D.D.C. 2017) (denying plaintiffs' motion for protective order where motion replied on, *inter alia*, news articles regarding deponent's dementia and plaintiffs' counsel's own assessment of deponent's dementia).  Generally stated medical opinions will not suffice; the opinion must specifically detail the harm the deponent is likely to suffer as a result of being made to testify.  *See Jennings v. Family Mgmt.*, 201 F.R.D. 272, 275 (D.D.C. 2001) (denying plaintiff motion for protective order where plaintiff's motion relied on opinion of clinical psychologist that was "marked by conjecture and generalization").  As the University points out, no opinion of a competent medical professional accompanies Ledwith's motion.  Resp. at 11.  Presented only with Ledwith's apparent *self*-assessment, which indeed merely states that a deposition would be

paying Ledwith's legal fees, Univ. Ex. 12 [Doc. 16] at 21:22-21:25, and the Court's previously stated impression that the universe of responsive documents likely is not large.

"difficult" and does not claim that it would be impossible or cause any specific harm, the Court cannot conclude that the subpoena for Ledwith's deposition must be quashed.

The University states that it has communicated with Ledwith's counsel regarding the University's willingness to modify the manner in which the deposition is conducted, so as to reduce the incidental burden Ledwith may face. *Id.* The University says that it is willing, among other things, to conduct the deposition by remote means (like others in the case), to allow Ledwith to take frequent breaks, to limit Ledwith's deposition to four hours, or to split Ledwith's deposition over several days. *Id.* By way of his reply, Ledwith offers to be deposed for only one hour in total. Reply at 5. In light of the apparent relevance of Ledwith's knowledge, outlined by the Court above, the Court does not believe that limiting Ledwith's deposition to a single hour is reasonable or appropriate. The Court encourages the University to limit the total time of Ledwith's deposition to four hours but will not mandate such a maximum; the Court will only order that the deposition take place over two days if more than four hours are required to complete Ledwith's examination, and that it take place by remote means. Ledwith should be able to take such breaks as are needed for his comfort and continuing ability to give testimony; counsel for both parties are generally encouraged to cooperate so as not to unnecessarily prolong the deposition.

## IV.   Conclusion and Orders

For the reasons set forth above, the Court concludes that Ledwith's documents and testimony are relevant, that their discovery would not be unduly duplicative, and that the September 2020 Subpoena does not impose an undue burden on Ledwith. Accordingly:

1. The Court ORDERS Ledwith to produce all documents responsive to the September 2020 Subpoena, consistent with this Court's guidance regarding relevance.

2. The Court ORDERS Ledwith to attend his deposition.  However, in light of Ledwith's physical condition, the Court further ORDERS the University to make the following accommodations: Ledwith shall be deposed by means of remote audiovisual technology, and if his deposition is to last more than four (4) hours, the deposition shall take place over two days (preferably consecutively).  In the event that two days are required to complete Ledwith's deposition, the first day of testimony shall last no longer than three and a half (3.5) hours.

Ledwith's motion to quash is GRANTED IN PART, insofar as the Court orders the accommodations above, and is DENIED IN ALL OTHER RESPECTS.  The Clerk of Court is directed to close this miscellaneous matter.

It is SO ORDERED.


Dated:          January 20, 2021
                New Haven, CT


                                          *s/ Charles S. Haight, Jr.*
                                          CHARLES S. HAIGHT, JR.
                                          Senior United States District Judge

18